HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAVID AND JEANNA CAMP, a marital community,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>HC COMPOSITES LLC, doing business as WORLD CAT, a North Carolina limited liability company,<br><br>　　　　　　　Defendant. | CASE NO. C11-5340 RBL<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>[Dkt. #12] |

*"The two happiest days of a man's life are the day he buys a boat,*

*and the day he sells it."*

THIS MATTER is before the Court on Defendant H.C. Composites' Motion for

Summary Judgment [Dkt. #12]. H.C. Composites is a North Carolina boat manufacturer selling

a line of catamarans under the brand name "World Cat." In 2008, Plaintiff Camp (a Washington

resident) purchased a used 2004 World Cat model 270 HTS fishing boat from one of World

Cat's largest dealers, Town Creek Marina, in North Carolina. The HTS model (of which only

three were ever built) was powered by Volvo Penta inboard diesel engines and outdrives, unlike

most World Cat models, which have outboard gasoline motors.

1
2
3
4
5
6
7
8
9
10
11



12      *A World Cat 270HTS (sister ship)*

13      Camp soon discovered that the World Cat HTS design may have allowed salt water to

14 enter the engine compartment and damage the expensive marine diesel engines.  He asked World

15 Cat to assist.  World Cat denied knowledge of any such problems, assured him the boat was

16 seaworthy, and told him to seal the hatches with foam.  Camp did so and ventured into the ocean,

17 where the engines were destroyed by salt water.  Camp sued, alleging fraud and violations of

18 Washington's Consumer Protection Act.  He seeks to recover the damage to the engines, treble

19 damages and attorneys' fees.

20      World Cat seeks summary judgment, arguing that this Court has no jurisdiction over it

21 and that Camp's state law claims are preempted by maritime law and barred by the economic

22 loss rule.  World Cat also argues that Camp's fraud and CPA claims fail in any event because he

23 had no contact with World Cat prior to purchasing the used boat "as is"  from a private seller.

24

1    In response, Camp focuses on his claim that, after he purchased the boat—but before he

2    undertook the trip that destroyed his engines—he sought and got specific reassurances from

3    World Cat that his World Cat 270 HTS did not have (and did not ever have) a water intrusion

4    issue, and that it was safe for its intended offshore fishing use.  These representations were

5    patently false.  Camp claims that, as a result, this Court has specific jurisdiction over World Cat,

6    and his claims are viable under Washington (rather than maritime or North Carolina) law.

7                                     **I. FACTUAL SUMMARY**

8          With limited exceptions, the facts of this case are well-documented and not disputed.

9    In search of a used fishing boat in the spring of 2008, David Camp located a 2004 World Cat

10   270HTS for sale at Town Creek Marina in Beaufort, North Carolina.  On April 5, 2008, he

11   offered $65,000 for the boat, subject to a survey, and his offer was accepted.  Camp hired a local

12   marine surveyor to survey the boat for him. The survey included a sea trial, after which the

13   surveyor reported that the engines "ran well" and that the boat was otherwise sound.

14         Camp brought the boat to his home in Lacey, Washington, and had the engines inspected.

15   Camp's local mechanic noted that the engine compartments showed "heavy corrosion" and

16   recommended that the engines be further inspected by a Volvo Penta dealer in Seattle.  On June

17   6, 2008, Camp sent an email to Town Creek Marina, identifying sixteen issues with the boat,

18   including the apparently defective transom design that allowed salt water intrusion.  He asked for

19   all prior service records on the boat and contact information for its prior owner, who had

20   similarly purchased the boat through Town Creek.  He also asked Town Creek to help him

21   convince World Cat to provide a replacement transom.  Town Creek did none of these things.

22         Five days later, Camp wrote to World Cat's president, Andrew Brown, outlining the

23   misrepresentations he thought Town Creek had made in order to sell him the boat, seeking to

24

1   have the engines rebuilt or replaced, and seeking a new transom to solve the water intrusion

2   problem.  On June 24, World Cat's Customer Care Manager, Phyllis Manning, emailed Camp

3   that World Cat had destroyed the transom mold and that he should seal the edges of the hatches.

4          On July 11, Manning sent Camp a copy of the 2004 HTS warranty, and offered to sell it

5   to him.  According to Camp, he called Manning the same day and asked again for prior service

6   records on the boat.  He claims Manning told him she was not aware of any leaking hatch

7   problems with the HTS model, and that, in response to his telling her that he planned to go

8   offshore in the boat, she told him that other HTS owners fished in tournaments without any

9   problems.  She again suggested that he seal around the hatches.  She also reiterated her offer to

10  sell Camp a warranty, which he declined, because the warranty would not by its terms cover the

11  water intrusion issue.  Manning did not provide the prior service records.

12         Manning does not recall this conversation (at least on July 11) but she does recall Camp

13  telling her that he did not need a warranty "because the boat was insured."  She denies ever

14  telling Camp that she did not know anything about leaking hatches on the HTS model[1].  At the

15  same time, Manning claims it is company policy not to disclose prior warranty claim

16  information.  She now admits that the boat in question (Hull #2 of 3) had been the subject of two

17  prior water intrusion incidents: one when it was brand new in 2004, which resulted in World Cat

18  repurchasing the boat from its original San Diego owner; and one in 2006, which resulted in

19  World Cat modifying the transom at its factory.  Manning claims that she therefore believed that

20

21  ───────────────

22         [1] After the misadventures described below, Camp discovered that the prior (second)
    owner of his boat, Kevin Spector, had sued World Cat for the same water intrusion problem.
          He also learned that at least two other owners of inboard-powered World Cat boats had
23  had the same problems.  One, Jim Cress (Florida), sold the boat without knowing the cause, and
    the other, Joe Dale (San Francisco), sued and settled.  Indeed, Camp claims that Manning herself
24  flew to Florida to see Mr. Dale's boat in an effort to remedy his water intrusion problem.

1  the water intrusion issue was resolved.  She does not claim that she ever told any of this to David

2  Camp.

3     Camp exchanged several emails with World Cat over the rest of the summer in an effort

4  to resolve the water intrusion issue.  He did not make any progress toward his stated goals of

5  new engines and a new transom, and instead sought to address the problem himself, in the

6  manner suggested by Manning: installing foam around the hatches in an effort to make them

7  more water proof.

8     On August 29, Camp took his family on the boat for its initial, shakedown cruise.  They

9  departed Zittel's Marina outside Olympia, Washington, in calm conditions.  Within three miles,

10  the port engine overheated, and they limped home on the starboard one.  Camp replaced an

11  apparently missing thermostat and, two weeks later, tried again.  This time, he took his wife and

12  son 36 miles into the Pacific from Westport, Washington, in search of tuna.  The port engine's

13  temperature was again problematic, but he was able to safely return to port.  There, Camp

14  discovered water on the air cleaner elements and, in an effort to resolve that problem, replaced

15  the air cleaner elements.

16     Though he had not yet run the boat without an engine-related incident, on September 19

17  Camp headed to sea once more.  This time, with five souls aboard, he ran 60 miles into the

18  Pacific.  The port engine blew a hose nipple and hydro-locked. The starboard engine ran, but not

19  well, and they could only make five knots.  The Coast Guard towed the boat the last ten miles to

20  port.   Camp claims that the boat suffered $84,000 in damage.

21     On October 15, Camp contacted Manning about the incident and reiterated his belief that

22  the transom design was the culprit.  Manning told Camp that a Mr. Scott Ellis would contact him.

23  Shortly thereafter, Camp contacted the prior owner, Kevin Spector, and learned that Spector had

24

1  had the exact same issues, and that World Cat had attempted to fix them.  Spector had instructed

2  Town Creek Marina to sell the boat for him, which it did, to David Camp.

3  It does not appear that Camp ever used the boat again.  What followed instead was a

4  flurry of letters and accusations, threats, demands and counteroffers.  World Cat flew Ellis out to

5  Lacey to look at the boat but he could not determine the cause of the issue.  Camp had the boat

6  surveyed again, and the local surveyor confirmed that the problem was water intrusion through

7  the transom, specifically the hatches and air vents.  Brown made a series of offers to resolve the

8  issue and Camp rejected them, demanding more or he would sue. Eventually, Camp's insurance

9  company "totaled" the boat and paid him $92,500.   Nevertheless, World Cat did not meet

10  Camp's remaining demands, and he sued.

11  **II. DISCUSSION**

12  **A.  Summary Judgment Standard.**

13  Summary judgment is appropriate when, viewing the facts in the light most favorable to

14  the nonmoving party, there is no genuine issue of material fact which would preclude summary

15  judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to

16  summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to

17  interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for

18  trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "The mere existence of a scintilla of

19  evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v.*

20  *Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Factual disputes whose resolution would not

21  affect the outcome of the suit are irrelevant to the consideration of a motion for summary

22  judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In other words,

23  "summary judgment should be granted where the nonmoving party fails to offer evidence from

24

1   which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at

2   1220.

3   **B.  Specific Personal Jurisdiction.**

4        World Cat argues that this Court does not have general jurisdiction over it because it does

5   not advertise or sell any products here[2], and Camp does not appear to contend that it does.

6   World Cat argues that the Court does not have specific jurisdiction over it because it did not

7   purposefully direct its activities toward Washington and did not avail itself of the privilege of

8   conducting activities in this state.

9        In the context of a challenge to the Court's jurisdiction, a plaintiff's factual allegations

10   are construed in the light most favorable to him.  Plaintiff is required only to make a prima facie

11   showing of personal jurisdiction. *See Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1082,

12   1087 (Fed. Cir. 2003).

13        Washington's long-arm statute[3] (RCW 4.28.185) represents legislative intent to assert

14   personal jurisdiction over a foreign entity to the full extent permitted by due process. *Byron*

15   *Nelson Co. v. Orchard Mgmt. Corp.*, 95 Wn. App. 462, 465 (1999).  "[D]ue process requires

16   only that in order to subject a defendant to a judgment in personam, if he be not present within

17   the territory of the forum, he have certain minimum contacts with it such that the maintenance of

18

19      [2] World Cat does have dealers and boats all over the U.S. (including Hawaii) and in other countries.  It advertises in national publications and maintains a full service website.  It has an employee in Washington to field sales calls and direct them to an out-of-state dealer.  The Court

20 can take judicial notice that late model World Cat boats currently ply Puget Sound.  Indeed, two of World Cat's sister boat lines—Glacier Bay and Livingston—were originally founded in

21 Washington State.
     Nevertheless, the Court's jurisdiction over World Cat in this matter is specific, not

22 general.
     [3] Camp argues that because the case is brought pursuant to diversity jurisdiction,

23 Washington's long arm statute has no application.  Without resolving that issue, the limits of due process are the limits of this Court's jurisdiction over World Cat, and that issue is addressed

24 below.

1 the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*

2 *v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

3   In Washington, courts use three criteria to determine specific jurisdiction: (1) the

4 nonresident defendant or foreign corporation must purposefully do some act or consummate

5 some transaction in the forum state; (2) the cause of action must arise from, or be connected

6 with, such act or transaction; and (3) the assumption of jurisdiction by the forum state must not

7 offend traditional notions of fair play and substantial justice, consideration being given to the

8 quality, nature, and extent of the activity in the forum state, the relative convenience of the

9 parties, the benefits and protection of the laws of the forum state afforded the respective parties,

10 and the basic equities of the situation. *Perry v. Hamilton*, 51 Wn. App. 936, 939 (1988); *see also*

11 *Freestone Capital Partners, L.P. v. MKA Real Estate Opportunity Fund*, 155 Wash. App. 643,

12 652–53 (2010) (quoting *Shute v. Carnival Cruise Lines*, 113 Wash. 2d 763, 767 (1989)).

13   These authorities are unremarkable and the parties do not disagree about their

14 applicability.  Camp emphasizes that his claims are intentional torts, that he was in Washington

15 when they were committed, and that World Cat knew it.  He cites the line of cases discussing the

16 "*Calder*-effects" test for personal jurisdiction.  (*Citing Calder v. Jones*, 465 U.S. 783 (1983)).

17   To determine whether it has personal jurisdiction to hear tort claims, the Court applies the

18 purposeful direction, *Calder*-effects test.  *Brayton Purcell LLP v. Recordon & Recordon*, 606

19 F.3d 1124, 1128 (9th Cir. 2010) To satisfy the purposeful direction test, the plaintiff must allege

20 that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3)

21 causing harm that the defendant knows is likely to be suffered in the forum state." *Id.*

22   The Ninth Circuit construes the intent required in an intentional act to mean "intent to

23 perform an actual, physical act in the real world, rather than an intent to accomplish a result or

24

1  consequence of that act." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 806 (9th

2  Cir. 2004).  Camp plainly alleges that World Cat, through Phyllis Manning, intentionally

3  misrepresented the nature and extent of the World Cat HTS transom/engine problems, and her

4  very specific knowledge of it.  These facts satisfy the first prong of the test.

5  The second prong of the purposeful direction test, express aiming, has proven difficult to

6  define and apply consistently.  *Attachmate Corp. v. Public Health Trust of Miami-Dade County*

7  *Fla.*, 686 F.Supp.2d 1140, 1147 (W.D.Wash. Jan. 13, 2010) (citing, *Bancroft & Masters, Inc. v.*

8  *Augusta Nat'l Inc.*, 22 F.3d 1082, 1087 (9th Cir. 2000) (express aiming "hardly defines itself");

9  *Wyatt Tech. Corp. v. Smithson*, 2005 WL 6132329, at *3 (C.D.Cal. Aug. 30, 2005) (application

10 of express aiming element has been "somewhat inconsistent)).

11 The Ninth Circuit has held the express aiming requirement satisfied when the defendant

12 allegedly "engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a

13 resident of the forum state." *Bancroft & Masters*, 22 F.3d at 1087.  In *Bancroft &Masters*, the

14 company that hosts the Masters golf tournament in Augusta, Georgia, wrote a letter to the

15 Virginia headquarters of Network Solutions, Inc., defending its "Masters" trademark against the

16 competing claim of a California corporation, Bancroft & Masters.  The Ninth Circuit held that

17 the letter was expressly aimed at California, and constituted purposeful availment under *Calder*.

18 The Masters' owners were therefore subject to specific jurisdiction in California when Bancroft

19 & Masters sued to resolve the competing trademark claims.  *Bancroft &Masters*, 223 F.3d at

20 1087.

21 As Camp correctly argues, this case closely resembles *Bancroft &Masters.*  It is not

22 unreasonable for World Cat to be haled into court in Washington, when it purposefully directed

23

24

1  its allegedly fraudulent and deceptive conduct into this state. The Court has specific personal

2  jurisdiction over World Cat.

3  **C.  Preemption/Choice of law**

4      World Cat argues that because the injury in this case—water intrusion into the engine

5  compartments—occurred at sea, this is an admiralty case to be decided under maritime law.  It

6  argues that, under maritime law, the economic loss rule prevents Camp from recovering for

7  damages to the product itself.   It argues that Camp's claim is in reality a warranty[4] claim.

8       Camp argues that state law intentional tort claims are not preempted by maritime law,

9  and that because there was no contract between the parties, Washington's economic loss rule

10  does not preclude his recovery.

11      World Cat's argument is based primarily on *Lecy v. Bayliner*, 123 Wash.2d 64 (1993),

12  but that case involved a products liability and negligence claim.  Camp correctly argues that

13  intentional torts like fraud are not subject to admiralty jurisdiction. *See Swift& Columbia*

14  *Packers v., Compania Columbiana del Caribe S.A.,* 339 U.S. 684 (1950).

15      World Cat also argues that North Carolina, and not Washington, substantive law applies,

16  if admiralty law does not.  It argues that while Camp's fraud and consumer protection claims are

17  essentially the same under Washington and California law,  North Carolina law does not permit

18  Camp to recover  purely economic loss that could have been allocated among the parties by their

19  contract. *Citing Reece v. Homette Corp.,* 429 S.E.2d 768 (1993).  Of course, there was no

20  contract between World Cat and Camp here, so World Cat's claim that the contract "allocated

21  

22       [4] World Cat's repeated references to the fact that Camp did not avail himself of the
opportunity to purchase a warranty and its claim that the leaking hatches were "a warranty item"
are misguided, and perhaps misleading.

23       First, the warranty does not, by its own terms, cover the leaking hatches.  More
importantly, Camp's claims are based not on the fact that the hatches leaked, but on the fact that
24  World Cat lied to him about that fact.

1   the risk of loss to Plaintiffs, not [World Cat]" [Def's MSJ, Dkt. # 12, at 22] is erroneous, and it

2   may be that North Carolina law would not limit Camp's potential recovery in any event.

3         The parties agree that Washington's choice of law rules apply, and that the bottom line

4   question is which state has the "most significant relationship" with the subject matter of the suit.

5   World Cat argues (here, and in opposing jurisdiction) that Washington has "a minimal, if any,

6   interest in this dispute," and that Washington has "no genuine interest" in  Plaintiff's claims.

7   [Def's MSJ, Dkt. #12, at 15].

8         Camp cites the Restatement (Second) of Conflicts and *Johnson v. Spider Staging Corp*.,

9   555 P.2d 997 (1976), for the proposition that Washington looks to four factors in determining

10   which state has the most significant relationship to the case:

11         (a)      the place where the injury occurred,

12         (b)      the place where the conduct causing the injury occurred,

13         (c)      the domicile, residence, nationality, place of incorporation and
                        place of business of the parties, and
14
15         (d)       the place where the relationship, if any, between the parties is
                        centered.

16         Camp argues that each of these factors supports his contention that Washington law

17   applies.  The injury occurred here and the centerpiece of the relationship between the parties—

18   the 270HTS—was located here.  The other two factors are split, but it is not debatable that World

19   Cat sent a variety of e-mails and telephone calls about the boat to Camp, knowing that he and it

20   were in Washington, and that both would be navigating Washington waters.  Additionally, Camp

21   correctly argues that while North Carolina has no interest in protecting its residents who defraud

22   others, Washington has a very clear interest in protecting its residents from fraud.  Washington

23   has the more significant relationship to the case, and Washington law applies.

24

1    World Cat argues that even Washington law precludes the recovery Camp seeks here,

2   under its "independent duty doctrine."  It cites *Carlile v. Harbour Homes, Inc*., 147 Wash.App

3   193, 203 (2008) for the proposition that a consumer (and a remote purchaser) cannot use tort

4   theory to obtain compensation for a defective product that fails to meet his expectations.

5    In the absence of the Camp's conversations with Manning and World Cat, this argument

6   might carry the day.  But as has been explained in this Order, Camp's claims are not based

7   primarily on the fact that he purchased a used, defective boat.  He claims instead that his boat

8   was damaged because he relied on the fraudulent misrepresentations and omissions of World

9   Cat.   World Cat is not entitled to summary judgment on this claim under Washington law.

10   **D.  Fraud.**

11    Camp argues that World Cat's actions amount to fraud under Washington law.  World

12   Cat argues that Camp cannot have reasonably relied on its representations that the hatches did

13   not leak, because he already knew that they did leak.  It again focuses on the fact that Camp

14   purchased the boat from a private seller, "as is," and claims that its false representations

15   therefore could not have caused the damage Camp incurred by purchasing a defective boat, as a

16   matter of law.

17    In Washington, a fraud claim requires the plaintiff to prove nine elements, by clear

18   cogent and convincing evidence:

19   (1)    representation of an existing fact;

20   (2)    materiality;

21   (3)    falsity;

22   (4)    the speaker's knowledge of its falsity;

23   (5)    intent of the speaker that it should be acted upon by the plaintiff;

24   (6)    plaintiff's ignorance of its falsity;

(7)     plaintiff's reliance on the truth of the representation;

(8)     plaintiff's right to rely upon it; and,

(9)     damages suffered by the plaintiff.

*Stieneke v. Russi*, 145 Wn.App. 544, 190 P.3d 60, 70 (2008).

The representations at issue are Manning's statements that she knew nothing about the water intrusion problem and that the boat was safe for its intended offshore use, as well her repeated failure to inform Camp that the opposite was true.  Elements 1-5 are met in the context of World Cat's Motion for Summary Judgment.

World Cat argues that Camp knew (or should have known) that Manning was lying; he already knew the hatches leaked.  It argues that he did not rely on the information he got (and did not get) from her, and that he had no right to do so in any event.  It also claims that he suffered no damage, again emphasizing that he bought the boat before he ever talked to World Cat.  The Court has already addressed the flaw[5] in this last argument.

The remaining issues—the reasonableness of Camp's reliance on Manning's representations, in the face of his own suspicions and fears about the hatches—present jury questions.   World Cat's position is that Camp's actions were less than prudent, regardless of what he was told, because he ventured into the ocean on a boat that had never run properly under his command.  They argue most persuasively that Camp did not have the right to rely on the assurances he got over the internet, when he had the actual boat and engines and corrosion in his possession, and he was complaining loudly to whoever would listen that he wanted a new transom and new engines.  That argument may very well resonate with a jury; it may determine

_____

[5] The parties mention but do not discuss the effect of the insurance settlement on Camp's damage claim.  This issue is not addressed in this Order.

1   that Camp could and should have avoided the catastrophic loss of his engines by not taking them

2   beyond the horizon without ensuring and knowing that the boat was seaworthy.

3        On the other hand, World Cat's argument is essentially that Camp should not have trusted

4   the boat's manufacturer about what it could and could not do; that Manning was therefore free to

5   tell him anything at all, and if damage (or loss of life) ensued, it was his own fault for believing

6   her, not hers.  The jury may believe that the proof Camp relied on Manning's assurances in the

7   face of his concerns is the fact that he *did* take his family into the Pacific on the World Cat.  It is

8   doubtful that he would put lives on the line if he did not honestly believe the boat was capable of

9   the trip.

10       World Cat's Motion for Summary Judgment on Camp's fraud claim is DENIED.

11  **E.  Consumer Protection Act.**

12       In order to establish a claim under Washington's Consumer Protection Act (Chapter

13  19.86 RCW) a plaintiff must establish that the defendant:

14       (1)    Engaged in an unfair or deceptive act, which

15       (2)    occurred in commerce, and

16       (3)    affected the public interest, and

17       (4)    proximately caused

18       (5)    damage to the plaintiff's business or property.

19
20  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85,

    719 P.2d 531 (1986).

21
22       World Cat argues that Camp cannot demonstrate elements 1, 3, and 5 as a matter

23  of law.  The flaw in World Cat's damages argument is addressed above.

24

It argues with respect to the first element that Manning's misrepresentations were not material, and that they did not have the capacity to "deceive a substantial portion of the public" because it only built three of the 270HTS boats.  At the same time, it argues that the line was not "plagued with problems" although it is apparent that this boat had three very unhappy owners, all due to the leaking hatch issue—the same issue that caused World Cat to repurchase this very boat from its original owner, replace an engine, and modify the transom.  It so argues, even though Camp has identified other owners of similarly designed World Cats experiencing the same issue.

Camp argues correctly that Manning's misrepresentations (both affirmative and by omission) are material; she told him the boat was seaworthy and that she was unaware of any similar issues.  This was demonstrably false.  The risk of the public's reliance on such statements is just not that their engines might be damaged; the loss of power at sea is an inherently dangerous situation, as World Cat's counsel would surely concede. World Cat affirmatively states that as a matter of policy, it does not disclose what it deems prior warranty claim[6] information to owners asking about their boats, and that stance is not limited to HTS model boats.  The "deceptive act" of which Camp complains is not limited to leaking stern hatches in the understandably limited run of HTS model World Cats; it is World Cat's alleged propensity to deceive any owner asking about design or manufacturing defects, in a manner that can cause damage to property or life.

_____

[6] Despite World Cat's repeated argument, Camp does not allege a warranty claim, and could not, under the warranty offered to him.  His claims are based on misrepresentations about a design defect of which World Cat was fully aware.

1    The public has a clear interest in redressing such claims.  World Cat's Motion for

2  Summary Judgment on Camp's CPA claim is DENIED.

3                                        * * *

4    World Cat's Motion for Summary Judgment [Dkt. #12] is DENIED, as its request

5  for fees under RCW 4.84.185.

6    IT IS SO ORDERED.

7    Dated this 24th day of July, 2012.

8

9

10                                  Ronald B. Leighton
                                   United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24