HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DAVID and JEANNA CAMP, a marital
community,

                Plaintiff,

    v.

H.C. COMPOSITES LLC, doing business
as WORLD CAT, a North Carolina
limited liability company,

                Defendant.

CASE NO. C11-5340RBL

FINDINGS AND CONCLUSIONS

       THIS MATTER was tried by the Court, sitting without a jury, beginning September 4, 2012, before the Court.  Plaintiff s David and Jeanna Camp were represented by William E. Pierson, Jr.  Defendant HC Composites d/b/a World Cat was represented by Susan Kaplan and Tom Waller of Bauer Moynihan & Johnson.  The Court has considered the evidence presented at trial, the exhibits admitted into evidence, the arguments of counsel and the Court being fully advised, now makes the following Findings of Facts and Conclusions of Law.

## I. FINDINGS OF FACT

       1.     Plaintiffs David and Jeanna Camp (hereafter "Camp") are citizens and residents of the Western District of Washington.

2.      Defendant H.C. Composites LLC d/b/a World Cat (hereafter "World Cat") was and is a limited liability company organized and existing under the laws of the State of North Carolina and whose principal place of business is located at 1090 West James Street, Tarboro, North Carolina.

3.      In May 2008, Camp purchased a previously-owned World Cat 270 HTS fishing boat.  The vessel was manufactured by World Cat.  The boat was purchased from a private seller in North Carolina without any involvement or knowledge whatsoever by World Cat.

4.      Camp paid $65,000 for the boat.  He subsequently insured the vessel for $92,950.

5.      Prior to his purchase, Camp hired a surveyor to inspect and sea-trial the vessel. The surveyor reported to Camp there were no significant problems with the boat and that it conformed to standards set forth by the American Boat and Yacht Council.

6.      Camp traveled to North Carolina to make his purchase.   Camp personally sea-trialed the boat prior to finalizing the deal.  He proceeded with the purchase, which occurred on May 15, 2008.  Kevin Spector was the seller of the boat.  Town Creek Marina (TCM) brokered the sale.

7.      Neither Spector nor TCM provided any information to camp about existing problems with the watertight integrity of the hatches at the stern of the boat.

8.      Camp subsequently trailered the boat to Washington State, making the drive himself.  Upon arrival of the boat in Washington, Camp had still made no communications or contact with World Cat.

9.      At Camp's request, a mechanic examined the boat in Washington on May 30, 2008.  The mechanic reported there was substantial corrosion throughout the engine

compartment, that the hatches might not seal against water intrusion, and that the lack of sealing

created a potential entry point for water into the engine compartment during operation.

10.     In response to the mechanic's report, Camp initiated a dialogue with TCM,

evidenced by substantial emails.  Camp accused TCM of wrongfully withholding from him

information about the condition of the boat's stern hatches, the water intrusion problem, and

misrepresenting the repairs it had done to the boat prior to purchase.  Camp demanded that TCM

pay for the parts and labor expenses incurred to re-do the repairs.

11.     Although Camp believed that TCM had knowledge that there was a water

intrusion problem that it did not disclose, he decided that he would pursue World Cat, rather than

TCM or Spector, to get the water issue resolved.

12.     Camp began a long series of communications with World Cat by alleging that

TCM failed to inform him about water intrusion problems with the boat's stern hatches.  He

suggested that World Cat rebuild or replace his engines, provide him a new transom for the boat,

trade him straight across for a new, bigger boat, and/or reimburse him for the cost of the boat

plus his expenses.

13.     In an email dated June 11, 2008, Camp stated that he would not take his family

out in his boat unless and until the water incursion problem was remedied.

14.     Camp's early communications with World Cat suggested that helping Camp

resolve the issue would be voluntary on World Cat's part, but he also suggested that doing so

would be commercially beneficial to World Cat.  Camp subsequently became more demanding,

and less rational, and ultimately claimed that World Cat had a legal obligation to help him.

15.     On June 24, 2008, Phyllis Manning, World Cat's Customer Care Manager,

informed Camp that World Cat had destroyed the fiberglass molds for the 270 HTS model.

1   Camp responded by again demanding a new transom, this time from a different World Cat

2   model.  Ms. Manning again explained that no transom was available for Camp's boat.  She

3   reiterated that he could seal his hatches before using the boat.  The June 24, 2008 and July 7,

4   2008 emails (Exh. A-10) confirm that Camp suggested that he could seal around the hatches but

5   that Phyllis Manning advised the obvious, that Camp would have to cut the seal every time he

6   needed access to the engines or install an inspection plate in the top of the hatch.

7        16.    The flaw in the boat's design involved more than the "leaky hatches."  The more

8   problematic issue was and is that there is an air intake immediately adjacent to the hatches and

9   directly over the turbocharged diesel engines.  This intake provides necessary air for the turbo.

10  The air intake is only 20" above the water line, and it is a major source of water being sucked

11  into the vent and into the turbos, damaging the engines.  Mr. Camp makes no claim of

12  misrepresentation about the air intake.

13       17.    Camp subsequently asked World Cat for prior service records on the boat.  Ms.

14  Manning replied that World Cat did not maintain service records on the boats it sold.

15       18.    On several occasions prior to his first voyage on the boat and prior to the alleged

16  conversation with Ms. Manning, Camp informed World Cat that he believed that 1) the engine

17  components had substantial corrosion; 2) the corrosion was due to sea water entry as a result of

18  leaking hatches; 3) the hatches were currently leaking; 4) if the boat were taken out on the ocean

19  with leaking hatches, sea water would enter the engine compartment; and 5) the entry of

20  seawater into the compartment would result in "hydrolocked" engines and the boat being dead in

21  the water.

22       19.    At trial, Camp testified that Ms. Manning told him that she did not know anything

23  about leaking hatch problems on the HTS model.  Ms. Manning was aware of the prior hatch

24

1  leaking problem with the Camp/Spector boat. She did not and would not have denied knowledge

2  of such problems.  Ms. Manning further testified that the only information that she had about

3  Camp's boat was that the leak discovered by TCM (in 2006, while the boat was owned by

4  Spector) had been fixed.

5       20.    The Court finds Ms. Manning more credible on this issue.

6       21.    Mr. Camp was not a credible witness.

7       22.    Because Ms. Manning was a more credible witness, and Camp has failed to

8  present independent documentary evidence supporting his allegation that Manning

9  misrepresented her knowledge regarding leaking hatches, Camp has produced insufficient

10  evidence to support a finding that Ms. Manning made a known false representation.

11       23.    Furthermore, even if Ms. Manning made a known false representation regarding

12  her knowledge about leaking hatches, Camp has produced insufficient evidence to meet his

13  burden of showing that the alleged misrepresentation was material, that Ms. Manning intended

14  that Camp act upon it, that Camp was ignorant of its falsity, that Camp had a right to rely on the

15  misrepresentation, that Camp justifiably relied on the truth of the misrepresentation, or that

16  reliance on the misrepresentation caused Camp any damage.

17       24.    At the time of his alleged conversation with Ms. Manning, Camp believed that the

18  hatches on his boat were leaking, that the problem had occurred before, and that the leaking

19  could disable his engines even during normal use.  Even if Manning did deny knowledge of

20  leaking hatches, that denial was not material.

21       25.    Given Camp's knowledge and understanding of the consequences of operating the

22  boat while the hatches were leaking, and given the fact that he had experienced problems with

23  the engines the first two times he operated the boat, the Court is further convinced that Camp

24

1   could not and did not reasonably rely on World Cat's lack of knowledge about a problem with

2   leaking hatches.

3        26.     Camp also testified that Ms. Manning told him that, if he placed foam seals on the

4   hatches, the leaking problem would be resolved.  Ms. Manning denied telling Camp to seal his

5   hatches with foam.  In light of the documentary evidence affirming Ms. Manning's testimony,

6   the Court finds that Ms. Manning is more credible on this issue.  Even if she told him that, he did

7   not believe it, and he knew that it was not true.  The hatches were not the only (and maybe not

8   even the primary) source of water in the engine compartment.

9        27.     Camp has suffered no damages as the result of any act or statement by World Cat.

10                     **II. CONCLUSIONS OF LAW**

11        1.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 (Diversity of

12   Citizenship).

13        2.     The Court looks to Washington law to determine the elements of fraud.  In order

14   to prevail on a fraudulent misrepresentation claim under Washington law, a plaintiff must prove

15   each of the following elements by clear, cogent and convincing evidence: "(1) representation of

16   an existing fact, (2) materiality, (3) falsity, (4) the speaker's knowledge of its falsity, (5) intent of

17   the speaker that it should be acted upon by the plaintiff, (6) plaintiff's ignorance of its falsity, (7)

18   plaintiff's reliance on the truth of the representation, (8) plaintiff's right to rely upon the

19   representation, and (9) damages suffered by the plaintiff."  *See, e.g.*, *Poulsbo Group, LLC v.*

20   *Talon Dev., LLC*, 155 Wash. App. 339, 345–46 (2010).

21        3.     To be clear, cogent and convincing, the evidence must be greater than a mere

22   preponderance.  *Markov v. ABC Transfer & Storage Co.*, 76 Wash. 2d 388, 395, 457 P.2d 535,

23   539 (1969).

24

1    4.    A representation of an existing fact must exist independently of: (1) any future

2    acts or actions on the part of the party making the statement, (2) the occurrence of any other

3    particular event in the future, and (3) the particular future uses of the person to whom the

4    statement is made. *Westby v. Gorsuch,* 112 Wash. App. 558, 571, 50 P.3d 284 (2002); *Shook v.*

5    *Scott,* 56 Wash. 2d 351, 356, 353 P.2d 431 (1960) ("Where the fulfilment or satisfaction of the

6    thing represented depends upon a promised performance of a future act, or upon the occurrence

7    of a future event, or upon particular future use, or future requirements of the representee, then the

8    representation is not of an existing fact.").

9    5.    Statements of opinion, predictions, and promises are not representations of an

10   existing fact. *Shook*, 56 Wash. 2d at 356.  The party to whom representations are made has a

11   duty to exercise diligence with regard to those representations. *Alejandre v. Bull*, 159 Wn.2d

12   674, 690, 153 P.3d 864, 872 (2007).

13   6.    The Court has considered the evidence presented at trial, the exhibits admitted

14   into evidence, the arguments of counsel and, being fully advised, finds that Camp has not met his

15   burden of showing each element of fraud by clear, cogent, and convincing evidence.

16   7.    To prevail in a private CPA action, a plaintiff must establish five elements: (1) an

17   unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4)

18   injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair

19   or deceptive act and the injury suffered. *Indoor Billboard/Washington, Inc. v. Integra Telecom*

20   *of Washington, Inc.*, 162 Wash. 2d 59, 73, 170 P.3d 10 (2007).  If plaintiff cannot prove all five

21   elements, the CPA claim must be dismissed. *Id.*

22   8.    For an act or practice to be "unfair or deceptive" it must have the capacity to

23   deceive a *substantial portion* of the public. *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wash. App.

24

722, 730, 959 P.2d 1158 (1998) (emphasis added) *reversed in part on other grounds*, 138 Wash. 2d 248, 978 P.2d 505 (1999).  An isolated misrepresentation to a single individual is insufficient to show the requisite capacity to deceive a substantial portion of the public.  *See Prasad v. Am. Family Mut. Ins. Co.*, C10-762Z, 2010 WL 5224133 (W.D. Wash. Dec. 14, 2010); *see also Venetian Stone Works, LLC v. Marmo Meccanica, S.p.A.*, C09-1497Z, 2010 WL 5138161, at *2 n. 1 (W.D. Wash. Dec. 8, 2010).  The CPA does not provide a remedy for "private wrongs" that do not affect the general public.  *Kazia Digo, Inc. v. Smart Circle Int'l, LLC*, C11-544RSL, 2012 WL 836233 (W.D. Wash. Mar. 12, 2012).  It is the likelihood that additional plaintiffs have been or will be injured in *exactly* the same fashion that changes a factual pattern from a private dispute to one that affects the public interest.  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 790, 719 P.2d 531, 538 (1986) (emphasis added).

9.      World Cat had no duty to disclose warranty claim records to Camp.  Any failure to distribute warranty claim records is not an unfair or deceptive trade act.

10.     To show public interest impact, plaintiffs must prove that a *real and substantial potential* for repetition exists, "as opposed to a *hypothetical possibility* of an isolated unfair or deceptive act's being repeated."  *Michael v. Mosquera-Lacy*, 165 Wash. 2d 595, 604-05, 200 P.3d 695, 700 (2009) (emphasis added).  It is unreasonable to infer an entire pattern of deceptive conduct affecting the public interest from an isolated incident.  *Segal Co. (E. States), Inc. v. Amazon.Com*, 280 F. Supp. 2d 1229, 1234 (W.D. Wash. 2003).

11.     As discussed above and for all the same reasons, the Court finds that Camp has not borne his burden of showing that any act or statement by World Cat had a public interest impact.

1       12.     The causation standard for a CPA claim is proximate cause, and the plaintiff must

2 establish that the injury would not have occurred but for the alleged unfair and deceptive act.

3 *Schnall v. AT & T Wireless Services, Inc.*, 171 Wash. 2d 260, 278, 259 P.3d 129, 137 (2011).

4       13.     The evidence at trial demonstrated that Camp had knowledge—based on the

5 events that allegedly occurred during the first two excursions—that the hatches on his boat were

6 leaking when he took his boat out on the third excursion.  Thus, there was no causal connection

7 between any alleged misrepresentation by World Cat and the alleged damages suffered by Camp.

8       14.     Therefore, this Court will direct the clerk to enter judgment for World Cat and

9 against Camp.  World Cat's claim for attorneys' fees is DENIED.

10 IT IS SO ORDERED.

12      Dated this 17th day of September, 2012.

Ronald B. Leighton
United States District Judge